**UMHOFER, MITCHELL & KING LLP**
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
767 S. Alameda St., Suite 270
Los Angeles, California 90021
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
matthew@umklaw.com
elizabeth@umklaw.com

**WILLIAMS & CONNOLLY LLP**
C. Bryan Wilson (*pro hac vice*)
Jennalee Beazley (*pro hac vice*)
680 Maine Avenue, S.W.
Washington, DC  20024
Telephone: (202) 434-5000
Fax: (202) 434-5029
cwilson@wc.com
jbeazley@wc.com

*Attorneys for Defendant*
*A Place For Mom, Inc.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION

| | |
|---|---|
| TARRA CASTILLO, an individual,<br><br>Plaintiff/Cross-Defendant,<br><br>v.<br><br>A PLACE FOR MOM, INC.,<br><br>Defendants/Cross-Claimants. | Case No. 5:24-cv-02672-JGB-DTB<br><br>*Honorable Jesus G. Bernal*<br><br>**DEFENDANT/COUNTER-PLAINTIFF A PLACE FOR MOM, INC.'S TRIAL BRIEF**<br><br>Trial Date: May 19, 2026 |

*A PLACE FOR MOM, INC.'S TRIAL BRIEF*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

CASTILLO'S CLAIMS.......................................................................................................1

    I.    First Claim: Disability Discrimination (Gov. Code § 12940(a)) ....................1

        A.   APFM Lacked Knowledge of Physical Disability.................................2

        B.   Physical Disability Was Not a Substantial Motivating Reason for APFM's Decision to Discharge Castillo's Employment.......................2

        C.   Castillo's Damages Cease No Later Than When She Leaves Frontier ......10

    II.   Second Claim: Retaliation due to Request for Accommodation (Gov. Code § 12940(m)(2))...............................................................................11

    III.  Third Claim: Retaliation for Opposing FEHA-Forbidden Practices (Gov. Code § 12940(h))..................................................................................11

        A.   There Is No Corroborating Evidence To Support Castillo's Claim that She Engaged in Protected Activity ..................................12

        B.   Temporal Proximity Alone Cannot Establish Pretext..............................13

        C.   APFM's Counterclaims Are Not "Additional Retaliation" ........................13

    IV.  Castillo's Additional Contentions................................................................15

        A.   Punitive Damages.................................................................................15

        B.   Supposed "Me Too" Witness: Cindie-Lou Scholer ...................................16

APFM'S AFFIRMATIVE DEFENSES .........................................................................18

    I.    At-Will Employee/Lawful Termination .........................................................18

    II.   Employee's Duty To Mitigate ......................................................................18

    III.  Same Decision/Mixed Motive......................................................................19

    IV.  After-Acquired Evidence ..............................................................................19

    V.   Offset and Unjust Enrichment .....................................................................19

APFM'S COUNTERCLAIMS ......................................................................................20

    I.    First Counterclaim: Intentional Misrepresentation/Fraud ............................20

    II.   Second Counterclaim: Negligent Misrepresentation....................................20

    III.  Third Counterclaim: Receiving Stolen Property (Cal. Pen. Code § 496(c)).................................................................................21

    IV.  Fourth Counterclaim: Breach of Fiduciary Duty/Duty of Loyalty .............21

CASTILLO'S AFFIRMATIVE DEFENSES.................................................................22

    I.    Authorization and Consent ...........................................................................22

*A PLACE FOR MOM, INC.'S TRIAL BRIEF*

II.   Failure To Prove Damages ................................................................22

III.   Good Faith ...........................................................................................22

IV.   Lack of Scienter and Intent ...............................................................22

V.   Retaliatory Motive ..............................................................................23

VI.   No Treble Damages Under Section 496(c) ........................................23

CONCLUSION ....................................................................................................23

ii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Avila v. Continental Airlines, Inc.*,
165 Cal. App. 4th 1237 (2008)..........................................................................2

*Burlington N. & Santa Fe Ry. Co. v. White*,
548 U.S. 53 (2006) .........................................................................................16

*Center for Healthcare Educ. & Rsch., Inc. v. Int'l Cong. for Joint Reconstruction, Inc.*,
57 Cal.App.5th 1108 (2020)............................................................................21

*Contreras-Velazquez v. Family Health Ctrs. of San Diego, Inc.*,
62 Cal.App.5th 88 (2021)................................................................................15

*Goodman-Gable-Gould Co. Tiara Condominium Ass'n, Inc.*,
595 F.3d 1203 (11th Cir. 2010).......................................................................14

*Gunchick v. Fed. Ins. Co.*,
No. CV 14-1162 , 2015 WL 1781404 (C.D. Cal. Apr. 20, 2015).........................18

*Hart v. Browne*,
103 Cal. App. 3d 947 (1980)............................................................................22

*Holmes v. Petrovich Dev. Co.*,
191 Cal. App. 4th 1047 (2011).........................................................................16

*In re Software Toolworks Inc.*,
50 F.3d 615 (9th Cir. 1994).............................................................................22

*Looksmart Grp., Inc. v. Microsoft Corp.*,
386 F. Supp.3d 1222 (N.D. Cal. 2019).............................................................14

*McInteer v. Ashley Distrib. Serv., Ltd.*,
40 F. Supp. 3d 1269 (C.D. Cal. 2014).....................................................5, 11, 13

*Meister v. Mensinger*,
230 Cal. App. 4th 381 (2014)...........................................................................21

*A PLACE FOR MOM, INC.'S TRIAL BRIEF*

*Nat'l Football League Props., Inc. v. ProStyle, Inc.*,

    16 F. Supp. 2d 1012 (E.D. Wis. 1998) ....................................................................14

*State Farm Mut. Auto. Ins. Co. v. Campbell*,

    538 U.S. 408 (2003) ...............................................................................................15

*Tennison v. Circus Circus Enters., Inc.*,

    244 F. 3d 684 (9th Cir. 2001) .................................................................................17

*Yanowitz v. L'Oreal USA, Inc.*,

    36 Cal. 4th 1028 (2005) .......................................................................................5, 12

**<u>Statutes</u>**

Cal. Pen. Code § 496(c) .......................................................................................21, 23

*A PLACE FOR MOM, INC.'S TRIAL BRIEF*

# INTRODUCTION

Plaintiff Tarra Castillo's Amended Memorandum of Contentions of Fact and Law (Dkt. 65, "P-Mem.") fails to establish facts and law that would permit Castillo to prevail on her claims of discrimination and retaliation or to defeat A Place for Mom's ("APFM") counterclaims of fraud, negligent misrepresentation, receiving stolen property, and breach of fiduciary duty.

Castillo's narrative of events contradicts the undisputed record evidence that APFM discharged Castillo for a legitimate, non-discriminatory reason.  There is no dispute that (1) Castillo changed the source of non-healthcare leads in APFM's lead tracking system, You've Got Leads ("YGL"), to credit her sales team with generating those leads without going through the required process and (2) Castillo failed to provide any back-up documentation to verify those changes (such as contemporaneous emails, screen shots, or texts from a healthcare sales representative on Castillo's team demonstrating that they in fact interacted with the family and prompted the inquiry to APFM).  The testimony of APFM's witnesses will establish that through an impartial investigation of all Regional Directors over a four-month period, APFM discovered that Castillo and Cindie-Lou Scholer were the only Regional Directors at the whole company who changed more than one non-healthcare lead.  APFM gave both Castillo and Scholer more than a week to provide back-up documentation to justify the changes they made, which could have been provided in minutes if it existed. To this day, Castillo has not provided the back-up documentation, and she never will because the leads she changed were not legitimately changed.

# CASTILLO'S CLAIMS

## I.    First Claim: Disability Discrimination (Gov. Code § 12940(a))

Castillo's key evidence listed in support of her disability discrimination claims fails to establish the elements of her disability discrimination claim, including because there is no evidence to support that (1) APFM knew that Castillo had a

1

physical disability, and (2) that Castillo's physical disability was a substantial motivating reason for APFM's decision to terminate Castillo's employment. Even if Castillo's evidence could support this claim, the Parties' experts agree that any damages incurred would stop no later than when she left her subsequent employment at Frontier due to injuries caused by an unrelated electric scooter accident.

### A.    APFM Lacked Knowledge of Physical Disability

Castillo contends that APFM knew of her physical disability based on her multiple FMLA leave approvals.  P-Mem. at 3.  However, for the reasons described in APFM's Memorandum of Fact and Law (Dkt. 63, "D-Mem."), knowledge that an employee took FMLA leave (which can be used for a number of reasons, including to help family members with medical issues) is not equivalent to knowledge of that employee's physical disability.  D-Mem. at 6, 8.  As APFM will establish through testimony of APFM's decision-makers—Katy Elster, James Thorman, and Rebecca Bursky—they were not aware of and did not inquire about the specific details or reasons for Castillo's medical leaves.  *Id.*  Taking medical leave or submitting medical forms that do not contain sufficient information to put the employer on notice of a disability does not establish the knowledge element of a disability discrimination claim.  *Avila v. Continental Airlines, Inc.*, 165 Cal. App. 4th 1237, 1247-48 (2008).

### B.    Physical Disability Was Not a Substantial Motivating Reason for APFM's Decision to Discharge Castillo's Employment

APFM had a legitimate, non-discriminatory reason for discharging Castillo's employment. The testimony of APFM's witnesses will establish that an investigation was prompted by discrepancies that appeared in lead data during a meeting on October 25, 2023, that was unrelated to Castillo entirely, much less her alleged physical disability.  APFM investigated *all* healthcare leads that had been changed by *any* Regional Director from July-October 2023.  The investigation revealed that Castillo and one other Regional Director, Cindie-Lou Scholer, were the *only* Regional Directors who reattributed more than one non-healthcare lead to their healthcare sales

teams without going through the requisite CRA Credit approval process. APFM gave both Castillo and Ms. Scholer more than a week to provide back-up documentation to justify the lead changes they made. Rather than providing it, Castillo (and Ms. Scholer) went out on FMLA leave the same day that Ms. Elster sent a follow-up request for the back-up documentation. There is no dispute that Castillo never provided the requested back-up documentation.

Castillo's contention that APFM's investigation and decision to terminate her employment was motivated by her physical disability and/or her taking FMLA leave rests primarily on the alleged hostility of her supervisor, Ms. Elster. P-Mem. at 3-5. However, Castillo's contentions fail to establish that any of Ms. Elster's actions were motivated (let alone *substantially* motivated) by Castillo's FMLA leave or physical disability. Even if she could make this showing, the evidence will show that multiple other APFM managers and executives independently assessed the evidence and determined to discharge Castillo based on that evidence, not her taking leave.

### i. Castillo's "Hostile Supervisor" Narrative is Unsupported

Castillo first asserts that Ms. Elster was "openly hostile" toward Castillo's medical leaves. P-Mem. at 3-4. However, Castillo's only evidence for this claim is a series of disputed and unverified statements attributed to Ms. Elster by Castillo and the fact that Castillo was required to arrange coverage for her team before going on leave in May of 2023. *Id.* at 3. Ms. Elster's testimony will refute that she made the statements alleged by Castillo and will establish that it was the usual practice for anyone in Castillo's position (a manager overseeing a team of sales representatives) to arrange proper coverage for their team before they went out on leave to the extent it was feasible to do so.

**ii.** **The Business Card Investigation and the Reprimand Are Irrelevant to the Adverse Action at Issue, and In Any Event Were Justified**

Castillo points to an investigation regarding her use of unapproved business cards and a reprimand from Ms. Elster as evidence of animus towards her physical disability and her taking FMLA leave. P-Mem. at 4-5. These events cannot support a finding that the adverse action at issue was motivated by discriminatory or retaliatory animus for at least three reasons: (1) there is no evidence that these events were unjustified or were in anyway motivated by Castillo's disability or her taking medical leave, (2) there is no evidence that these events were adverse employment actions, and (3) there is no evidence that these events influenced the decision to discharge Ms. Castillo's employment months later.

First, other than the fact that these events took place while Castillo was on leave, there is **no** evidence that these events were in any way motivated by Castillo's physical disability or her taking medical leave. There is likewise **no** evidence to support Castillo's claims that the business card investigation was "false" or that the verbal warning (which Castillo incorrectly describes as a "written reprimand") was based on "fabricated" disciplinary grounds. P-Mem. at 4-5. Castillo does not dispute that she had used/approved unbranded business cards nor does she dispute the concerns Ms. Elster raised in her verbal warning to Castillo. With respect to the timing, Ms. Elster's testimony will establish that the timing of these events happened because while Ms. Elster was managing Castillo's team while Castillo was on leave, Elster was alerted to several concerns regarding Castillo's management of her team.

Second, there is no evidence that these events constituted adverse employment actions. Castillo's own contentions concede that there were no disciplinary or corrective actions taken beyond the verbal warning itself. P-Mem. at 4-5. Additionally, in September 2023 Castillo received a positive mid-year evaluation from Ms. Elster, further signaling that these events did not have any lasting impact

*A PLACE FOR MOM, INC.'S TRIAL BRIEF*

on Castillo's position at the company. An "adverse employment action" is one that "materially affects the terms, conditions, or privileges of employment." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1052-55 (2005). These events are not adverse employment actions because no aspect of Castillo's employment was changed as a result of them: she did not lose her job, nor did she lose any territory, compensation, or responsibilities.

Finally, there is no evidence to show that these events—which took place months before the investigation into lead changes began in late October 2023—had any impact on APFM's decision to terminate Castillo's employment. The only evidence connecting these events in summer of 2023 with APFM's discharge decision in November 2023 is temporal proximity. Even if there was sufficient temporal proximity between these events, temporal proximity alone cannot establish that an employer's legitimate, nondiscriminatory reason was pretextual. *McInteer v. Ashley Distrib. Serv., Ltd.*, 40 F. Supp. 3d 1269, 1287-88 (C.D. Cal. 2014).

### iii.   Castillo Cannot Establish that APFM's Reason for Discharge Is Pretextual.

It is undisputed that Castillo made the lead changes without going through the CRA credit approval process and that she never provided back-up documentation to verify the accuracy of these changes. These undisputed facts alone establish that APFM's decision to discharge Castillo's employment was not pretextual.

#### a.   *APFM's investigation and decision were valid and objective*

Castillo attempts to undermine the validity and objectivity of the lead-change investigation and resulting decision to terminate her employment with a series of factual contentions, but her claims are factually unsupported and/or irrelevant:

- Castillo contends, without any evidentiary support, that her lead edits were "correctly assigned." The accuracy of Castillo's edits is exactly what APFM asked Castillo to verify in November 2023 when her supervisors

requested back-up documentation for the changes she had made. It is undisputed that Castillo never provided the back-up documentation.

- Castillo contends that "[t]he information needed to verify the accuracy of those edits was available to Elster and management directly in the YGL system at all times" and that the decision to terminate her employment was unjustified in part because APFM did not "review the YGL system notes." P-Mem. at 5-7. This is fantasy, made up because no record evidence supports Castillo's theories. In any event, whether APFM attempted to verify Castillo's lead changes is irrelevant to the question of whether she made the changes outside of the required process and whether *she* could verify the changes she made. APFM put the onus on Castillo to verify the accuracy of her actions, which was a routine request she could have done in minutes, but she indisputably failed to do. In any event, Ms. Elster and Mr. Davis will testify regarding the efforts they made to check whether Castillo's lead changes were justified, including checking the CRA credit inbox for evidence of back-up documentation. They found nothing to verify Castillo's lead changes. Additionally, the healthcare sales team witnesses will testify that the back-up documentation came from various sources (typically, inquires from healthcare sources via email), not notes in YGL.

- Castillo contends that APFM "had reached a conclusion of fraud and theft before its own deadline." P-Mem. at 6, 9. First, there was no "deadline." Second, APFM's decision makers, Ms. Bursky, Ms. Elster, and Mr. Thorman, will consistently testify that they had not made a final decision with respect to Castillo's employment until they concluded the investigation and until Castillo had failed to provide any back-up documentation. They will also testify that if Castillo provided the back-up documentation to support the changes she had made at any point during

6

*A PLACE FOR MOM, INC.'S TRIAL BRIEF*

the investigation that would have impacted their decision.

- Castillo contends that APFM's decision was also unjustified in part because APFM did not "identify any dollar amount of alleged overpayment." P-Mem. at 6-7. APFM's decision makers will consistently testify that the exact dollar amount at issue was not relevant to the decision because there was a zero-tolerance policy for fraud—a common-sense policy that Castillo knew about. Once they determined that Castillo made the lead changes outside of the required process and that she did not provide the back-up documentation supporting these changes, it was not necessary to determine the dollar amount to conclude that she had committed fraud and therefore could not remain at the company, which works with protected, vulnerable populations.

- Castillo points out that Ms. Bursky, who made the final decision, did not speak with Castillo or Scholer directly, did not personally review YGL, and did not follow "written investigation protocols." P-Mem. at 6-7. Ms. Bursky, who has worked in Human Resources for more than 25 years and has conducted dozens of workplace investigations, will testify that this investigation was conducted and documented consistently with her typical practice. Ms. Bursky will also testify regarding the actions she took to ensure that the investigation treated all Regional Directors equally.

### b. *Regional Directors were not permitted to edit the source of non-healthcare leads.*

Castillo further tries to establish pretext by contending that she was permitted to edit leads as Regional Director and that she had been "trained to review unassigned or incorrectly sourced leads in the YGL system." P-Mem. at 5, 7. But this misrepresents the policy at issue: while Castillo had permission to edit her own team's healthcare leads (also called initial channel "IC" leads), Castillo was **not** permitted to edit non-healthcare leads, much less re-attribute them into healthcare

7

leads. Testimony from APFM leaders in the healthcare sales team in 2023, including Ms. Elster, Mr. Davis, Mr. Thorman, and Castillo's peers, including Jen Pugh and Kellie Bivens, will establish that this was a long-standing policy at APFM. To change the source of a non-healthcare lead, Regional Directors were required to submit a request to the sales operations department, CRA Credit. The fact that Castillo and Ms. Scholer were the only two (out of eight) who had changed more than one non-healthcare lead over a four-month period is evidence of this policy. The October 13, 2022, email Castillo references in her contentions (P-Mem. at 7) is consistent with this policy; in that email Elster explicitly states "all reattributed editing go to CRA credit.  Ic referrals you can edit."

Moreover, Castillo's contention regarding unassigned leads is irrelevant; unassigned leads were not at issue in the investigation or discharge decision.  The lead changes at issue in the investigation were leads that had a non-healthcare source (such as internet or family).  Any time Castillo spends on unassigned leads is merely an attempt to change the subject and distract from her misconduct.

### c.   *Castillo had ample time to provide the back-up documentation*

As Castillo stated in her memorandum, Ms. Elster and Mr. Thorman met with Castillo on November 1, 2023, via zoom to request the back-up documentation.  P-Mem. at 6.  A week later, on November 8, 2023, Castillo had not provided any documentation.  If Castillo had the backup documentation, it would not have been difficult to gather and send (as Castillo, herself, insinuates in her contentions by suggesting that someone at APFM should have done this for her).  Testimony from APFM's sales team employees will establish that a week (indeed, an hour or less) was ample time for Castillo to provide the documentation if it existed.

On November 8, 2023, Ms. Elster sent a follow-up email again requesting the back-up documentation and set a November 10 deadline to provide it.  Castillo acknowledged the request and stated that she would provide the documentation by

the deadline.  As Castillo stated in her contentions, rather than provide the documentation, later that same day she sought to go on leave for stress.  P-Mem. at 6.

Castillo contends that she could not gather the back-up documentation after she went on leave on November 8 because her access to APFM's systems was cut off.  P-Mem. at 6.  However, Castillo's leave was not officially approved until November 13, and evidence shows that Castillo emailed HR from her APFM email on November 10, 2023—proving that she was not locked out of the system at that point.  Castillo did not provide the documentation by November 10 and did not contact anyone to explain that she would not be able to get the documentation by that time or request an extension to the deadline.  APFM was not required to hold a decision regarding Castillo's employment in abeyance simply because Ms. Castillo went on supposed stress-leave after being confronted with evidence of her misconduct.  D-Mem. at 5.

### d.    *APFM's investigation treated all Regional Directors equally*

Castillo contends that APFM's investigation selectively investigated Castillo for a disproportionately longer period than all other Regional Directors.  P-Mem. at 7.  This is not true.  The testimony and documents regarding the investigation in 2023 unequivocally establish that a full audit was conducted into all leads changed by all Regional Directors for July-October 2023.  Castillo's contention regarding APFM spreadsheets confuses the audit that was conducted in October 2023 with a separate data pull from January 2025 after Castillo sued APFM.  The January 2025 data set encompassed Castillo's lead changes since October 2021 and is the basis of APFM's after-acquired evidence affirmative defense (as well as proof in support of APFM's counterclaims).  Unbeknownst to APFM when it made the decision to discharge Castillo based on her failure to provide documentation for 13 improper lead changes, she had actually improperly changed 61 leads starting in August 2022.

*A PLACE FOR MOM, INC.'S TRIAL BRIEF*

This January 2025 spreadsheet (which was produced with a document name that aptly identified it as created on 1/14/2025) was not part of the investigation in 2023 and cannot therefore be used to establish a disparate treatment of Castillo. If anything, this spreadsheet further establishes that Castillo knew the policy against changing non-healthcare leads herself because between October 2021-August 2022, she did not change the source of any non-healthcare leads.

### e. Castillo's performance at APFM cannot establish pretext

Whether Castillo's performance evaluations were "consistently positive" is not relevant to the question of whether APFM's stated reason for discharge is pretextual. APFM discharged Castillo because she changed the source of non-healthcare leads without going through the CRA approval process and she failed to provide the back-up documentation supporting these changes. Neither of these reasons is influenced by Castillo's previous performance evaluations. If anything, the fact that Castillo took numerous FMLA leaves throughout her tenure at APFM and nevertheless received raises and positive performance reviews is evidence of the fact that she was not discriminated or retaliated against for having medical conditions or for taking FMLA leave.

### C. Castillo's Damages Cease No Later Than When She Leaves Frontier

Castillo contends that she is entitled to lost wages and benefits from the date she was discharged through the date of trial and to future lost earnings and benefits beyond the date of trial. P-Mem. at 8. However, for the reasons articulated APFM's Motion *in limine* No. 1 (Dkt. 44), Castillo's economic damage must stop no later than the date that she left Frontier, March 20, 2025. Castillo's testimony, interrogatory responses, and medical records all establish that Castillo left her job at Frontier because of injuries she sustained to her leg from an electric scooter accident that had nothing to do with APFM or its conduct. Castillo's own expert testified

*A PLACE FOR MOM, INC.'S TRIAL BRIEF*

that "losses would stop from the date that she was no longer able to work because of the unrelated injury." (Dkt. 44-5 at 45:14-16.)   Given both parties' experts' agreement on this issue, Castillo should be permitted to argue no other damages claim at trial.

## II. Second Claim: Retaliation due to Request for Accommodation (Gov. Code § 12940(m)(2))

Castillo's key evidence listed in support of her retaliation based on accommodation claim is largely the same evidence as discussed above for her disability discrimination claim and fails for the same reasons articulated above.

The only additional evidence Castillo describes in relation to her second claim is that she repeatedly requested accommodation and that APFM approved each of her requests. P-Mem. at 9. This is undisputed. Castillo then contends that "[t]he close temporal proximity" between the accommodations and the adverse action "supports the inference of retaliatory motive." *Id.* As stated above, however, temporal proximity alone cannot establish that an employer's legitimate, nondiscriminatory reason was pretextual. *McInteer*, 40 F. Supp. 3d at 1287-88.  Moreover, Castillo's treating physician, Dr. Medina will testify that Castillo had fully recovered from her hysterectomy by the end of July in 2023, and the last accommodation Castillo requested that was even arguably related to her hysterectomy was in August 2023, almost three months before the lead-change investigation began in late October 2023. Castillo's next accommodation request (for stress-leave) was on November 8—a full week after Ms. Elster had requested the back-up documentation from Castillo on November 1.

## III. Third Claim: Retaliation for Opposing FEHA-Forbidden Practices (Gov. Code § 12940(h))

Castillo's key evidence listed in support of her retaliation based on opposing FEHA-forbidden practices claim is again largely the same evidence as discussed above for her disability discrimination claim and fails for the same reasons articulated

above. The additional evidence Castillo describes in support of this claim are factually incorrect or legally baseless.

A. **There Is No Corroborating Evidence To Support Castillo's Claim that She Engaged in Protected Activity**

Castillo contends that she complained to Mr. Thorman that Ms. Elster was retaliating against her for requiring medical leave, which he denies. There is nothing to corroborate Castillo's claim regarding the substance of her complaint to Mr. Thorman. Castillo herself testified that she only made a "generalized statement" to Mr. Thorman about her concerns, that she never complained to anyone other than her co-workers that she was afraid to take leave, and that she never complained to HR. Internal complaints qualify as protected activity only if they "sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner." *Yanowitz*, 36 Cal. 4th at 1047. "[V]ague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate will not suffice to establish protected conduct." *Id.* Thus, Castillo's own description of her complaint to Thorman as a "generalized statement" contradicts her contention that she engaged in a protected activity by complaining to him.

Mr. Thorman's testimony will establish that Mr. Thorman set up a meeting with Castillo as part of a general practice of checking in with Regional Directors, and that during their conversation, Castillo made some complaints about "not being heard" by Ms. Elster. There is no evidence that Mr. Thorman understood Castillo to be making any sort of discrimination or retaliation claim at all, nor that he "dismissed" Castillo's complaint or that he "directed Castillo to confront Elster directly." P-Mem. at 11. The testimony will establish that Mr. Thorman suggested Ms. Elster to meet with Castillo and a member of HR to clear up any communication issues they might be having. This chain of events cannot support Castillo's contention that Mr. Thorman "ratified the retaliation." P-Mem. at 11.

12

*A PLACE FOR MOM, INC.'S TRIAL BRIEF*

Additionally, there is **no** evidence to support Castillo's contention that "Elster continued to scrutinize Castillo's work" beyond the undisputed fact that Elster continued to supervise Castillo and several others. P-Mem. at 11. Indeed, Ms. Elster gave Castillo a positive mid-year evaluation in September 2023 and there is no evidence of any issues until the lead-change investigation in late October 2023.

## B.    Temporal Proximity Alone Cannot Establish Pretext

Castillo's only stated connection between her claimed protected activity and her discharge is temporal proximity. *See* P-Mem. at 12. As stated, temporal proximity alone cannot establish that an employer's legitimate, nondiscriminatory reason was pretextual. *McInteer*, 40 F. Supp. 3d at 1287-88.

## C.    APFM's Counterclaims Are Not "Additional Retaliation"

Castillo contends that APFM's counterclaims "are independently actionable as retaliation and constitute powerful circumstantial evidence of pretext." P-Mem. at 13. There are numerous fatal flaws with Castillo's contentions on this point.

First, for the reasons explained in APFM's Motion *in limine* No. 3 (Dkt. 49-1), filing and prosecuting counterclaims is an activity protected by California's litigation privilege and, therefore, Castillo is legally barred from claiming damages resulting from APFM's counterclaims. APFM brought compulsory counterclaims against Castillo for the causes of action arising from the same lead-change investigation at issue in her case, a privileged activity anyone can undertake.

Second, Castillo never disclosed her claim that APFM's counterclaims are a form of retaliation. Castillo is therefore barred from using this newfound theory at trial. APFM's interrogatories asked Castillo to identify and describe all facts relating to her claims of retaliation and harm allegedly caused by APFM's conduct. Dkt. 44-2 at Interrog. Nos. 1 & 2. Castillo responded to APFM's interrogatories on June 18, 2025, well after APFM filed its January 23, 2025 counterclaims. *Id.* Yet nowhere in Castillo's interrogatory responses did she identify APFM's counterclaims as the basis for her retaliation claim or explain how the counterclaims have caused Castillo harm.

*Id.* Castillo never amended her interrogatory responses to encompass this new theory. Rule 26(e)(1)(A) imposes a continuing duty to supplement interrogatory responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect" and Rule 37(c)(1) "precludes a party who violates that obligation from 'us[ing] that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless.'" *Looksmart Grp., Inc. v. Microsoft Corp.*, 386 F. Supp.3d 1222, 1227-32 (N.D. Cal. 2019) (finding that a party's materially shifted damages theory triggered the supplementation obligation under Rule 26(e), and failure to satisfy it would ordinarily result in preclusion); *see Goodman-Gable-Gould Co. v. Tiara Condominium Ass'n, Inc.,* 595 F.3d 1203, 1211-13, n.26 (11th Cir. 2010) (affirming exclusion of evidence because inadequate supplemental interrogatory responses and statements made during a deposition did not provide notice of the party's theory of liability); *Nat'l Football League Props., Inc. v. ProStyle, Inc.*, 16 F. Supp. 2d 1012, 1016-17 (E.D. Wis. 1998) ("courts have refused to allow parties to amend interrogatory responses to assert new theories even when trial is not imminent but when discovery has closed and summary judgment motions have been filed."). Castillo's trial-eve invocation of a totally new theory of retaliation is not substantially justified and would be highly prejudicial to APFM. Accordingly, Castillo should be precluded from using this previously-hidden theory as part of her retaliation claim.

Third, Castillo cannot show that APFM's counterclaims are baseless. Castillo notably never moved to dismiss APFM's counterclaims and there is ample evidence produced and generated through discovery (including from Castillo herself) to support APFM's counterclaims. The only argument Castillo raises to undermine the validity of the counterclaims is that APFM has not calculated a specific dollar amount for its damages. But, as APFM explained in its opposition to Castillo's Motion *in limine* No. 3 (Dkt. 60), APFM has disclosed sufficient damage-related information and does not intend to offer a rigid or formulaic damages calculation for its

counterclaims.    Moreover, as explained above, APFM's decision-makers will consistently testify that the specific dollar amount impacted by Castillo's lead changes was not relevant to finding fraud. It was enough that Castillo did not go through the required approval process and did not provide back-up documentation to substantiate the changes she made.

Finally, the decision APFM made to file its counterclaims in response to Castillo's lawsuit in October 2024 has no bearing on any of the conduct at issue in Castillo's complaint.  The conduct at issue all took place in 2023.  APFM choosing to file counterclaims in January 2025, after all the decision makers (Ms. Elster, Mr. Thorman, and Ms. Bursky) had left the company does not make it more or less likely that the decisions made in 2023 were motivated by discriminatory or retaliatory animus or that the stated reason for discharge is pretextual.

## IV.    Castillo's Additional Contentions

Castillo raised several contentions in her Memorandum that are not specifically classified under one of her three causes of action.

### A.    Punitive Damages

Castillo contends that she is entitled to punitive damages and lists unsubstantiated evidence in support of this claim that is completely unrelated to the conduct or claims at issue in this case. This is improper because "[a] defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003); *see also Contreras-Velazquez v. Family Health Ctrs. of San Diego, Inc.*, 62 Cal.App.5th 88, 107 (2021).

Castillo improperly uses her claim for punitive damage to raise a slew of unsubstantiated and highly prejudicial allegations regarding claims of racial discrimination. P-Mem. at 15. For the reasons explained in APFM's Motion *in limine* No. 4 (Dkt. 45), allegations of racial animus are irrelevant to the claims of disability

discrimination and retaliation for FMLA leave at issue in this case.  No trial time should be wasted trying to debunk these scurrilous, irrelevant allegations.

### B.   Supposed "Me Too" Witness: Cindie-Lou Scholer

Castillo contends that Ms. Scholer, a disgruntled former APFM employee who was discharged for the same misconduct, is a "critical 'me too' witness" who "experienced materially identical conduct from Elster" and whose employment was also terminated while she was on FMLA leave.  What Castillo omits from her Memorandum is that Castillo and Scholer both requested to go on FMLA leave on November 8, *after* the lead-change investigation had already started, *after* they were identified as the only two Regional Directors who had changed a material number of leads, *after* they had both been asked to provide the back-up documentation supporting the lead changes they had made, *after* they had both been asked a second time to provide it, and *after* they had both failed to do so. The lead-change investigation could not possibly have been prompted by Castillo and Ms. Scholer taking FMLA leave in November 2023, after the investigation had begun and revealed their misconduct.

### i.   Scholer's Complaints About Ms. Elster Are Unrelated to Disability Discrimination or FMLA Retaliation

Castillo contends that Scholer's complaints to HR regarding Ms. Elster put APFM on notice that Ms. Elster "targeted employees who took protected leave." P-Mem. at 16-17. But this is unsupported by the complaint emails themselves. The emails of Scholer complaining are not about discrimination, retaliation, or anything related to FMLA leave, but rather are about petty workplace grievances regarding Ms. Elster's management style. Employment laws like Title VII do not establish "a general civility code for the American workplace" and do not protect against "petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *accord Holmes v. Petrovich Dev. Co.*, 191 Cal. App. 4th 1047, 1061 (2011) ("It

appears [plaintiff] expects FEHA to be a civility code. It is not."). Castillo's plan to call Scholer to rain down a slew of such petty slights on the jury will not prove any element of her case.

If necessary, Ms. Bursky will testify that she did not investigate Ms. Scholer's complaints because she only investigates violations of the code of conduct and Ms. Scholer's complaints never rose to that level. Ms. Bursky did, however, meet with Ms. Scholer and help assist her through the concerns she claimed to have with Ms. Elster.

Ms. Castillo further contends that Ms. Scholer's testimony will establish that Ms. Elster had been engaging in this conduct since Ms. Scholer's first week at APFM. P-Mem. at 16. If anything, this 'tough boss' narrative (designed to tarnish the reputation of a good manager) only underscores the fact that Ms. Elster's conduct at issue in Castillo's complaint in the summer of 2023 was not a departure from how Ms. Elster acted in the past and was therefore not motivated by Castillo's FMLA leave in 2023.

### ii. Scholer's Testimony Regarding Racial Animus Is Inadmissible and Irrelevant

Castillo also contends that Ms. Scholer's testimony is useful to bring in claims of "racially charged conduct." P-Mem. at 17. But this case has nothing to do with supposed "racially charged conduct." For the same reasons stated above and in APFM's Motion *in limine* No. 4 (Dkt. 45), allegations of racial animus are irrelevant to the claims of disability discrimination and retaliation for FMLA leave at issue in this case. Ms. Scholer's testimony regarding racial discrimination, which should never be admitted, would be highly prejudicial to both APFM and to the individuals at issue, who have never been accused of such conduct previously and vehemently deny these false allegations. If Ms. Scholer is permitted to testify regarding her unsubstantiated claims of racial discrimination, there will inevitably be a "mini trial" to adjudicate these claims. *See Tennison v. Circus Circus Enters., Inc.*, 244 F. 3d

684, 690 (9th Cir. 2001) (affirming trial court's decision to exclude testimony regarding irrelevant allegations of harassment that may result in a wasteful "mini trial"); *Gunchick v. Fed. Ins. Co.*, No. CV 14-1162 , 2015 WL 1781404, at *6 (C.D. Cal. Apr. 20, 2015) (granting motion *in limine* to exclude evidence of alleged complaint of sexual harassment because it "will only create a side-show that has nothing to do with Plaintiff's wrongful termination claim premised on his disability." (internal quotations omitted)).

\* \* \*

For the foregoing reasons, Castillo will fail to establish any of her claims with the evidence she identified in her Memorandum of Contentions of Fact and Law.

### APFM'S AFFIRMATIVE DEFENSES

Castillo failed to identify evidence to refute the affirmative defenses APFM maintained in its Memorandum (D-Mem. at 13-16).

### I.   At-Will Employee/Lawful Termination

Castillo contends that at-will status does not permit termination for an unlawful reason. P-Mem. at 18. APFM agrees—and the decision to terminate employment here was not for an unlawful reason. As described above, evidence establishes that APFM did not discharge Castillo "because of" a protected characteristic or protected activity, but because she stole from the company by making unauthorized changes to lead data and failed to provide documentation substantiating those changes. D-Mem. at 13.

### II.   Employee's Duty To Mitigate

Castillo was hired by Frontier Communications in a substantially similar position in March 2024, approximately three and a half months after losing her job with APFM. D-Mem. at 14. Castillo's own testimony will establish that her position at Frontier—managing a sales team—was comparable to her position with APFM. After an off-work electric scooter accident caused Castillo serious injury to her leg, she resigned for a severance package rather than keep that job. D-Mem. at 14. Castillo's testimony, interrogatory responses, and medical records will establish this

18

fact.   Castillo's economic damage should cease no later than when Castillo left Frontier because APFM's conduct had nothing to do with the reason Castillo left this comparable employment. To the extent that Castillo could work, APFM is entitled to reduction of any damages by the amount Castillo could have earned had she retained that comparable employment.

## III.   Same Decision/Mixed Motive

Castillo's evidence with respect to this affirmative defense is the same evidence she describes in support of her claims. Based on the evidence APFM has produced regarding the lead-change investigation, even if the jury finds any discriminatory or retaliatory motive, the evidence will have also established that APFM would have discharged Ms. Castillo anyway based on its stated reason: that she changed lead data without going through the CRA Credit approval process and failed to provide back-up documentation supporting the changes. D-Mem. at 15.

## IV.   After-Acquired Evidence

Castillo contends APFM cannot establish its after-acquired evidence defense because her lead changes were "consistent with prior instruction." (P-Mem. at 19.) As described above with respect to Castillo's claims, the evidence will establish otherwise. Testimony from Jared Davis, along with corroborating lead data reports, will establish that Ms. Castillo impermissibly edited 61 leads between August 2022 and October 2023, which resulted in 11 move-ins. D-Mem. at 15–16.

## V.   Offset and Unjust Enrichment

Castillo contends that "[t]here is no evidence that Castillo unjustly received any benefit" and that "APFM has produced no evidence of any amount of overpayment after full discovery." P-Mem. at 23-24.  These contentions are wrong. It is undisputed that Castillo's compensation as a Regional Director at APFM was in part based on the number of healthcare leads attributed to her sales team that resulted in a move-in.  Business records produced by APFM establish Castillo's compensation and the number of leads she improperly changed along with how many of those leads

resulted in a move-in, thereby impacting her compensation. Testimony and a summary table will establish these facts from which the jury can then determine how much Castillo improperly received as a result of her misconduct.

## APFM'S COUNTERCLAIMS

### I.     First Counterclaim: Intentional Misrepresentation/Fraud

Castillo contends that APFM's fraud counterclaim fails because Castillo's lead edits were "authorized corrections." P-Mem. at 26. As described above, the evidence will establish that Ms. Castillo's changes were not authorized. APFM business records and testimony will establish that: (1) YGL tracks who made changes in the system; (2) Ms. Castillo's user-ID was associated with changes that attributed initially non-healthcare leads to her sales team; (3) documentation supporting legitimate lead changes would have been readily accessible; and (4) Ms. Castillo never provided any documentation substantiating her changes despite repeated requests. D-Mem. at 17-18. Ms. Castillo had a clear motive to misrepresent lead sources because her compensation and her team members' compensation, as well as their performance metrics, was directly impacted by these numbers. D-Mem. at 18. Business records will establish that numerous of the lead changes Castillo made resulted in move-ins, thereby increasing the bonus compensation she received. D-Mem. at 18. This is sufficient evidence to support APFM's claim of fraud.

### II.     Second Counterclaim: Negligent Misrepresentation

Castillo raises the same contention with respect to APFM's second counterclaim. P-Mem. at 26-27. The same evidence supporting the fraud claim supports APFM's alternative misrepresentation claim. This claim does not require proof that Ms. Castillo knew her changes were false, only that she had no reasonable basis for believing they were accurate. D-Mem. at 19–20. The undisputed fact that Castillo failed to provide backup documentation to support the accuracy of her changes within a week of the request is enough to establish that she did not have a reasonable basis to believe that her changes were accurate.

20

*A PLACE FOR MOM, INC.'S TRIAL BRIEF*

**III.    Third Counterclaim: Receiving Stolen Property (Cal. Pen. Code § 496(c))**

Castillo contends "no property was stolen" because she "received her ordinary compensation in exchange for performing her duties." P-Mem. at 27. The evidence, however, will show that Castillo received compensation she did not rightly earn by falsely inflating her team's lead numbers. D-Mem. at 16.

**IV.    Fourth Counterclaim: Breach of Fiduciary Duty/Duty of Loyalty**

Castillo contends that this counterclaim cannot be established because she "performed functions that she was authorized and directed to perform." P-Mem. at 27. As established above, Castillo was not authorized to edit the source of non-healthcare leads (non-IC leads) herself and, by doing so, she was acting adversely to APFM's interests and unjustly inflating her and her team's compensation.

Castillo further contends with respect to this counterclaim that the "disgorgement remedy cannot be calculated because APFM has identified no specific period of disloyalty, no inaccurate edit, and no amount of alleged loss." P-Mem. at 27-28.  Wrong.  Business records and a summary table establish how much Castillo earned in compensation and in the time periods in which she made improper lead changes and which of those lead changes resulted in a move-in. This evidence satisfies APFM burden of "producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain" *Center for Healthcare Educ. & Rsch., Inc. v. Int'l Cong. for Joint Reconstruction, Inc.*, 57 Cal.App.5th 1108, 1126-27 (2020) (citing *Meister v. Mensinger*, 230 Cal. App. 4th 381, at 399 (2014)). The burden then shifts to Castillo to "present evidence of costs, expenses, and other deductions to show the actual or net benefit the [fiduciary] received" in order to establish the portion of income she should be permitted to maintain.  Moreover, "breach of the duties of loyalty and full disclosure may justify forfeiture of ***all*** income." *Id.* at 1127 (emphasis added).  Notably, Castillo made no effort to meet her

*A PLACE FOR MOM, INC.'S TRIAL BRIEF*

burden: her damages expert offered no opinion whatsoever on the counterclaim damages she owes.

**CASTILLO'S AFFIRMATIVE DEFENSES**

Castillo will not meet her burden to prove any of her affirmative defenses.

**I.    Authorization and Consent**

Castillo's contention that she was authorized to change the lead source of non-healthcare leads (P-Mem. at 28) fails because of the evidence described above establishing that Regional Directors were **not** permitted to edit non-healthcare leads.

**II.    Failure To Prove Damages**

Castillo's contention that APFM failed to produce evidence of damages fails for the reasons described above and described in APFM's Opposition to Castillo's Motion *in limine* No. 3 (Dkt. 60).

**III.    Good Faith**

Castillo's contention that she acted in good faith (P-Mem. at 28) is unsupported by the evidence establishing that she did not follow the required CRA approval process to change non-healthcare leads and that she failed to provide the back-up documentation supporting these changes.

**IV.    Lack of Scienter and Intent**

Castillo's contention that she lacked intent to deceive or steal (P-Mem. at 28) is unsupported by the clandestine manner in which she made the changes without informing her supervisor or following the CRA Credit process, as well as the circumstantial evidence that there was a clear financial incentive to reattribute non-healthcare leads to her sales team and thereby increase her compensation. Circumstantial evidence is permitted to establish the scienter element of fraud. *See Hart v. Browne*, 103 Cal. App. 3d 947, 957 (1980); *In re Software Toolworks Inc.*, 50 F.3d 615, 627-28 (9th Cir. 1994). D-Mem. at 17. Moreover, the business records show that Castillo started making these improper changes in August 2022 and made

22

61 improper changes between then and when she was discharged in November 2023—showing a deliberate, repeated pattern rather than simply a one-time mistake.

## V.      Retaliatory Motive

Castillo's contention that APFM's counterclaims are retaliatory (P-Mem. at 28) fails for the reasons described above and in APFM's Motion *in limine* No. 3 (Dkt. 49-1).

## VI.     No Treble Damages Under Section 496(c)

Castillo's contention that no property was stolen (P-Mem. at 28) fails for the same reasons described above with respect to APFM's third counterclaim.

## CONCLUSION

For the foregoing reasons, the contentions Castillo outlined in her Memorandum of Contentions of Fact and Law will not enable to her to prevail on any of her claims or to defeat APFM's counterclaims.

Respectfully submitted,

Dated: May 12, 2026                     **UMHOFER, MITCHELL & KING LLP**

/s/ *Elizabeth A. Mitchell*
Matthew Donald Umhofer
Elizabeth A. Mitchell

**WILLIAMS & CONNOLLY LLP**
C. Bryan Wilson
Jennalee Beazley

*Attorneys for Defendant/Cross-Claimant*
*A Place For Mom, Inc.*

23

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant/Cross-Claimant A Place for Mom, Inc., certifies that this brief contains **6,980** words, which complies with the word limit of L.R. 11-6.1.

Dated: May 12, 2026                    **UMHOFER, MITCHELL & KING LLP**


/s/ *Elizabeth A. Mitchell*
Elizabeth A. Mitchell